# In the United States Court of Federal Claims

**FOR PUBLICATION**

No. 25-1315T
(Filed: July 23, 2026)

|  |  |
|---|---|
| **I HEALTH AND LIFE INSURANCE SERVICES**, | ) ) ) |
| *Plaintiff,* | ) ) ) |
| v. | ) ) ) |
| **UNITED STATES**, | ) ) ) |
| *Defendant.* | ) ) ) |

*Samuel D. Brotman*, Brotman Law, San Diego, CA, for plaintiff.  With him on the brief were *Tara Nicole Pullano* and *Rojin Kayla Bijan*, Brotman Law, San Diego, CA.

*Elizabeth B. Villarreal*, Trial Attorney, Tax Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for defendant.  With her on the briefs were *Brett A. Shumate*, Assistant Attorney General; and *Joshua Wu*, Deputy Assistant Attorney General, *David I. Pincus*, Deputy Director, and *Jason E. Bergmann*, Assistant Director, Tax Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC.

## OPINION AND ORDER

***BONILLA, Judge***.

I Health and Life Insurance Services (I Health) claims a $50,000 tax refund for the employment tax quarter ending September 30, 2020 (Q3 2020), attributed to the Employee Retention Credit (ERC) under section 2301 of the Coronavirus Aid, Relief, and Economic Security (CARES) Act, Pub. L. No. 116-136, 134 Stat. 281, 347–51 (2020) (codified as amended at 26 U.S.C. § 3134).  The government counterclaims, seeking the return of a nearly $400,000 ERC-based tax refund remitted to I Health for the employment tax quarter ending June 30, 2021 (Q2 2021).  Pending before the Court is defendant's motion for judgment on the pleadings pursuant to Rule 12(c) of the Rules of the United States Court of Federal Claims (RCFC).  The motion is limited to I Health's Q3 2020 tax refund claim and does not include the government's

counterclaim.  For the reasons discussed below, the Court will defer ruling on the motion until after I Health has an opportunity to amend its complaint to address the deficiencies discussed herein.

## BACKGROUND

Founded in 2017, I Health is a life and health insurance sales agency based in California, with call centers operating in Fresno and San Diego counties.  Prior to March 2020, the company's customer service representatives reportedly "sat in close-quarters in open-air cubicles, and relied on location-specific technology tools and high-speed internet."  ECF 14 at 4–5.

On March 4, 2020, California Governor Gavin C. Newsom declared a state of emergency in response to the COVID-19 pandemic.  Pursuant to that declaration, the governor issued Executive Order No. N-25-20 eight days later, instructing "[a]ll residents . . . to heed any orders and guidance of state and local public health officials, including but not limited to the imposition of social distancing measures, to control the spread of COVID-19."[1]  ECF 25-1 at 5.  The March 12, 2020 directive was followed by Executive Order Nos. N-33-20 and N-60-20, dated March 19 and May 4, 2020, respectively, requiring residents to stay home and defining the relationship between local governments' COVID-19–prevention measures and the State Public Health Officer's planned reopening framework.[2]  The March 19, 2020 directive "order[ed] that Californians working in . . . [sixteen] critical infrastructure sectors"—sectors previously designated by the federal government as "vital to the United States"[3]—

---

[1] Although some of the state- and local government–issued directives cited and discussed herein are self-styled as "orders," *see, e.g.*, ECF 25-1 at 4, 8 (Executive Order N-25-20: "This Order is not intended to . . ."), until they are analyzed in Part II(A), *infra*, the Court refers to them as "directives" to avoid the implication that they should preemptively be considered "orders" as that term is understood under the ERC statute.

[2] *See* Cal. Exec. Order No. N-33-20 (March 19, 2020) (directing "all individuals living in the State of California to stay home or at their place of residence except as needed to maintain continuity of operations of the federal critical infrastructure sectors"), *available at* https://perma.cc/R2R3-SEB3; Cal. Exec. Order No. N-60-20 (May 4, 2020) (discussing implementation of local jurisdictions' measures to combat the COVID-19 pandemic in light of the state's planned "reopening of lower-risk . . . and . . . higher-risk businesses and spaces"), *available at* https://perma.cc/K5XU-ECBM.  These directives remained in place until they were rescinded by Executive Order N-07-21, issued on June 11, 2021. Cal. Exec. Order No. N-07-21 (June 11, 2021), *available at* https://perma.cc/F6N7-W9HK.

[3] Executive Order No. N-33-20 links to a page on the United States Department of Homeland Security, Cybersecurity and Infrastructure Security Agency (CISA) website titled "Identifying Critical Infrastructure During COVID-19."  *See* Cal. Exec. Order No. N-33-20 (March 19, 2020) (" . . . except as needed to maintain continuity of operations of the federal critical infrastructure sectors, as outlined at https://www.cisa.gov/identifying-critical-infrastructure-during-covid-19").  The contemporaneous version of that webpage is no longer publicly available, but CISA maintains an updated webpage with the same title.  *See Identifying Critical Infrastructure During COVID-19*, CISA (Aug. 13, 2020) ("NOTE: This information was originally posted on March 19 and was updated on August 13, 2020."), *available at* https://perma.cc/YHJ5-59CR.  The updated webpage contains a list of "16 Critical

"may continue their work because of the importance of th[o]se sectors to Californians' health and well-being."  Cal. Exec. Order No. N-33-20 (March 19, 2020).  Among the critical sectors was "Healthcare and Public Health Sector."[4]  The May 4, 2020 directive clarified that the state's reopening plan would not "be construed to limit the existing authority of local health officers to establish and implement public health measures . . . that are more restrictive than, or that otherwise exist in addition to," the statewide measures.  Cal. Exec. Order No. N-60-20 (May 4, 2020).  Together, these directives contemplated a phase-in reopening plan that would pair statewide guidance with rules and recommendations promulgated by local jurisdictions, allowing each locality to address their unique challenges while pursuing the collective goal of limiting the spread of the COVID-19 virus in California.

On the heels of these Executive Orders, the Acting State Public Health Officer issued a directive on May 7, 2020, allowing certain "lower-risk" businesses to reopen under particular conditions.  ECF 25-1 at 11–13.  The May 7, 2020 directive tracked "California's Pandemic Roadmap," which itself "identifie[d] four stages" of the state's economic recovery efforts:

> safety and preparation (Stage 1), reopening of lower-risk workplaces and other spaces (Stage 2), reopening of higher-risk workplaces and other spaces (Stage 3), and finally an easing of final restrictions leading to the end of the stay at home order (Stage 4).

*Id.* at 11.  In announcing the shift into Stage 2, the May 7, 2020 directive allowed for local health officials to "implement or continue more restrictive public health measures if [they] believe[d] conditions in that jurisdiction warrant[ed] it."  *Id.* at 12.

Governor Newsom simultaneously released "Updated Industry Guidance," providing both general and industry-specific reopening guidance.  The general guidance provided, among other things:

1. Perform a detailed risk assessment and implement a site-specific protection plan

2. Train employees on how to limit the spread of COVID-19, including how to screen themselves for symptoms and stay home if they have them

3. Implement individual control measures and screenings

4. Implement disinfecting protocols

---

Infrastructure Sectors," *see id.*, that the Court assumes remains unchanged from the contemporaneous version of the website.

[4] *See supra* note 3.

3

    5.  Implement physical distancing guidance

*Governor Newsom Releases Updated Industry Guidance*, GOVERNOR GAVIN NEWSOM (May 7, 2020) (internal hyperlink for "screen themselves for symptoms" omitted), *available at* https://perma.cc/FUZ8-E78N.

Notwithstanding their early attempts to begin reopening the economy, state-level officials—facing additional challenges presented by the COVID-19 virus—later adapted their reopening efforts. On August 28, 2020, for example, the Acting State Public Health Officer, acknowledging that "[c]ommunity spread of infection remain[ed] a significant concern across the state[,]" issued a directive "to further refine the [state's] approach in order to gradually reopen businesses and activities while reducing the risk of increased community spread." ECF 25-1 at 16. The updated framework—referred to as "California's Plan for Reducing COVID-19 and Adjusting Permitted Sector Activities to Keep Californians Healthy and Safe"—would "rely on a set of [t]iers corresponding to specific epidemiological profiles based on indicators of disease burden . . . ." *Id.* at 17. Each county was assigned one of four color designations based on its then-current positivity rate: purple (widespread), red (substantial), orange (moderate), and yellow (minimal).[5] "For each progressive [t]ier, this framework w[ould] permit a broader range of reopening guided by risk-based criteria pertinent to each sector." ECF 25-1 at 17. The new framework went into effect on August 31, 2020. At that time, and continuing through the rest of Q3 2020, Fresno and San Diego counties—where I Health was operating call centers—reportedly experienced either widespread (purple) or substantial (red) COVID-19 positivity rates.[6] Accordingly, both counties were subject to heightened restrictions.[7]

Separate from the Governor Newsom's and the State Public Health Officer's directives, on November 20, 2020, the California Occupational Safety and Health Standards Board adopted its own "Emergency Temporary Standards" to facilitate safe returns to work while "protect[ing] workers from hazards related to COVID-19."[8] Codified in the California Code of Regulations, the temporary emergency standards

---

[5] *See Governor Newsom Unveils Blueprint for a Safer Economy, a Statewide, Stringent and Slow Plan for Living with COVID-19*, GOVERNOR GAVIN NEWSOM (Aug. 28, 2020), *available at* https://perma.cc/C4E3-48ZE.

[6] In mid-April 2021, Fresno County progressed from red (substantial) to orange (moderate), where the county remained through mid-June 2021, when the color-coding designations appear to have ended. San Diego County progressed from red (substantial) to orange (moderate) in early-April 2021, and then to yellow (minimal) in mid-June 2021.

[7] *See supra* note 5 ("For example, in the Purple (Widespread) tier where the disease is widespread, restaurants can only operate outdoors. But once a county has achieved a lower level of disease transmission and moved into the Red (Substantial) tier, restaurants can operate with 25 percent capacity indoors or 100 patrons, whichever is fewer.").

[8] *See Standards Board Unanimously Adopts Emergency Temporary Standards to Protect Workers from COVID-19*, CAL. DEP'T OF INDUS. RELS. (Nov. 20, 2020), *available at* https://perma.cc/DN78-ATFF.

generally applied to "all employees and places of employment,"[9] and included but were not limited to: implementing COVID-19 prevention controls (e.g., remote work, social distancing, alternative work spaces, adjusted schedules), COVID-19 testing, exposure notifications, and face masks.  *See* CAL. CODE. REGS. tit. 8, § 3205(c)–(f).  The standards were readopted on June 17, 2021, through Executive Order N-09-21.[10]

The last of the statewide directives cited in I Health's complaint is the Acting State Public Health Officer's December 3, 2020 "Regional Stay At Home Order."[11] Facing a critical shortage of intensive care unit (ICU) beds, the directive implemented regional restrictions on in-person gatherings if ICU capacity fell below fifteen percent.  Impacted residents were required to stay home "except as necessary to conduct activities associated with the operation, maintenance, or usage of critical infrastructure"; critical infrastructure sectors, in turn, were required to "continue to modify operations pursuant to the applicable sector guidance."[12]  I Health asserts that Fresno and San Diego counties were effectively closed pursuant to this order "from December 7, 2020, to January 24, 2021."  ECF 14 at 10.

In addition to these statewide COVID-19 regulations, both Fresno and San Diego counties implemented their own local directives.  On March 27, 2020, the Interim Health Officer for the County of Fresno issued a directive requiring all employers to screen employees for febrile respiratory illness and place symptomatic employees on sick leave for at least a week, followed by two weeks of isolation.[13]  The Interim Health Officer thereafter issued follow-on directives, each superseding the last, that carried forward previous guidance and often added new instructions, such as: requiring businesses looking to reopen to provide an alternative plan to the Fresno County Department of Public Health if they did not believe they could comply with state reopening guidelines; suggesting that residents wear masks while working indoors; and directing employers to send anyone who had been in close contact with a person who tested positive for COVID-19 home.[14]  All the Fresno County directives

---

[9] The state code included four exceptions not relevant here, including employees who work alone, work from home, telework, or face "occupational exposure" (e.g., healthcare workers).  *See* CAL. CODE. REGS. tit. 8, §§ 3205(a)(2), 5199(b).

[10] Executive Order N-09-21 waived the 10-day period normally required "to review emergency regulations after they have been submitted to the office . . . ."  Cal. Exec. Order No. N-09-21 (June 17, 2021), *available at* https://perma.cc/5GBL-SA3D.

[11] *See Regional Stay At Home Order*, CAL. DEP'T OF PUB. HEALTH (Dec. 3, 2020), *available at* https://perma.cc/WKQ4-EMJR.

[12] *See supra* note 11.

[13] The directive defined "febrile respiratory illness" as "a new or worsening episode of either cough or shortness of breath, presenting with fever (temperature 38 degrees C or 100.4 degrees F or higher) or chills in the previous 24 hours . . . ."  ECF 25-1 at 21.

[14] *See* ECF 25-1 at 24–30 (July 23, 2020 directive); *Order of the Health Officer*, CNTY. OF FRESNO DEP'T OF PUB. HEALTH (Dec. 22, 2020) [hereinafter *Dec. 22, 2020 Directive*], *available at*

"encourage[d] voluntary compliance" but noted that "violation of th[e] order[s] [wa]s subject to fine, imprisonments or both . . . ."[15]  They were rescinded on June 11, 2021, by operation of Executive Order N-07-21.  Cal. Exec. Order No. N-07-21 (June 11, 2021).

San Diego County issued similar directives.  On March 27, 2020, for example, the Public Health Officer of the County of San Diego issued a directive that cited the stay-at-home directive in Executive Order N-33-20 and further required "[a]ll businesses [to] enact social distancing, increase[] sanitation standards, and . . . make every effort to use telecommuting for its workforce."  ECF 25-1 at 32.  Additional instructions, imposed via similar directives, followed.  Businesses remaining in operation "and that allow[ed] members of the public to enter a facility" were directed to "prepare and post . . . a 'Social Distancing and Sanitation Protocol' . . . and provide evidence of its implementation to any authority enforcing th[e] Order upon demand." *Id.* at 88.  Individuals "who ha[d] been diagnosed with COVID-19, or who [we]re likely to have COVID-19," were instructed to follow isolation protocols.  *Id.* at 56. "[E]ssential business[es] and reopened business[es]" were directed to "[r]equire all employees to wear face coverings . . . [and] conduct temperature screening of all employees . . . ."  *Id.* at 54.  The San Diego County directives required employers to exclude employees who had a fever of 100 degrees or higher, exhibited COVID-19 symptoms, or were recently exposed to the virus.  ECF 28-1 at 5–6.  Employers were further directed to notify the county of an employee's exposure to COVID-19. ECF 25-1 at 67, 80.[16]  Finally, on December 10, 2020, San Diego County incorporated the state's regional stay-at-home directive and required residents to remain in their homes (except for employees or customers traveling to and from businesses in state-authorized sectors).[17]  All the San Diego County directives, like their Fresno County counterparts, noted that "[v]iolation of th[e] Order[s] [wa]s subject to fine, imprisonment, or both," and further added that "th[e] Order[s] may be enforced by the Sheriff or chiefs of police . . . ."  *See, e.g.*, ECF 25-1 at 35, 42–43, 59, 72, 85.

San Diego County also issued business reopening plans.  On May 5, 2020, it released the "Reopen San Diego: Business Safety Framework," which "required [each

---

https://perma.cc/XUZ6-D2XR; *Order of the Health Officer*, CNTY. OF FRESNO DEP'T OF PUB. HEALTH (Feb. 22, 2021) [hereinafter *Feb. 22, 2021 Directive*], *available at* https://perma.cc/SWD6-K457.

[15] ECF 25-1 at 22, 29; *Dec. 22, 2020 Directive*, *available at* https://perma.cc/XUZ6-D2XR; *Feb. 22, 2021 Directive*, *available at* https://perma.cc/SWD6-K457.

[16] For other San Diego County directives mentioned in I Health's complaint, see *Order of the Health Officer and Emergency Regulations*, CNTY. OF SAN DIEGO HEALTH & HUM. SERVS. AGENCY (Oct. 10, 2020), *available at* https://perma.cc/SFX6-HNV5; *Order of the Health Officer and Emergency Regulations*, CNTY. OF SAN DIEGO HEALTH & HUM. SERVS. AGENCY (May 6, 2021), *available at* https://perma.cc/UZ8P-29E9.

[17] *Order of the Health Officer and Emergency Regulations*, CNTY. OF SAN DIEGO HEALTH & HUM. SERVS. AGENCY (Dec. 10, 2020), *available at* https://perma.cc/W4GK-249E; *accord* ECF 14 at 16 ¶ 56 (noting that the December 10 directive "incorporated the state['s] regional stay at home order").

6

business] to develop a Safe Reopening Plan (SRP) that ensure[d] [certain] guidelines [we]re implemented" before reopening to the public.[18]  ECF 25-1 at 45.  The guidelines to be implemented through SRPs focused on employee and customer safety, sanitation, social distancing, and communication at the workplace.  A directive dated May 8, 2020—violation of which was, again, subject to fine, imprisonment, or both—stated that "[a]ll reopened businesses must prepare and post [an SRP] . . . for each of their facilities in the county."[19]  Most of the San Diego County directives remained in place until June 15, 2021.[20]

I Health contends that, although it considered itself an essential business and, as such, continued operating its two call centers throughout the pandemic, it still "was only permitted to operate in compliance with the strict, ever-changing restrictions imposed by the state and relevant county governments."  ECF 14 at 17.  In particular, I Health asserts that it "suffered myriad disruptions to its business" in its attempt "to comply with . . . the . . . state and county requirements" outlined above.  *Id.* at 9.  I Health's preventive measures reportedly included:

- "[C]omply[ing] with social distancing requirements" by "implement[ing] greater distance between its workstations and install[ing] clear barriers . . . ," *id.* at 13;

- "[T]est[ing] each of its employees prior to their shifts" and complying with the requirement to exclude employees from the workplace if they tested positive, *id.* at 17;

- "[I]ncreas[ing] the distance between its call center employees' workstations to comply with the social distancing mandates," *id.* at 17;

- "[T]ransition[ing] a small portion of its workforce to remote work . . . [by] providing those employees [with] expensive and complex equipment so they could efficiently complete their work, *id.* at 17–18;

---

[18] The copy of the San Diego Business Safety Framework is undated, *see* ECF 25-1 at 44–48, but I Health dates it May 5, 2020, in its complaint, *see* ECF 14 at 13.

[19] *See Order of the Health Officer and Emergency Regulations*, CNTY. OF SAN DIEGO HEALTH & HUM. SERVS. AGENCY (May 8, 2020), *available at* https://perma.cc/8LKU-JK5E.

[20] *Limited Order of the Health Officer*, CNTY. OF SAN DIEGO HEALTH & HUM. SERVS. AGENCY (June 15, 2021), *available at* https://perma.cc/77CN-4WVF ("Effective June 15, 2021, the Order of the Health Officer and Emergency Regulations, dated May 6, 2021, and any other Health Officer orders related to COVID-19 shall expire . . . .").  The rescission directive excepted designated previous directives from the June 15, 2021 end date: "'Isolation of All Persons with or Likely to have COVID-19,' dated December 24, 2020"; "'Quarantine of Persons Exposed to COVID-19,' dated April 5, 2021"; and "[a]ny quarantine or isolation order issued to an individual that is currently in effect."  *Id.*

- "[P]rovid[ing] . . . sanitization supplies and masks to those employees who continued working onsite," *id.* at 18; and

- Granting supplemental paid sick leave to its employees under the Emergency Paid Sick Leave Act, Pub. L. No. 116-127, §§ 5101–11, 134 Stat. 178, 195–201 (2020), and California SB-95, codified at CAL. LAB. CODE §§ 248.2–3 (West 2021), ECF 14 at 18.

These measures allegedly "restricted [I Health]'s ability to maintain adequate staffing at its facilities," "reduc[ed] its capacity significantly," caused it to "incur[] significant costs," and forced it to "experience[] a decrease in [its] operational capacity." ECF 14 at 17–18. I Health further asserts the measures "fundamentally altered [its] workspace" and "caused a partial suspension of [its] business operations for all periods at issue." *Id.* at 19.

Seeking compensation for those disruptions, I Health filed five Forms 941-X (Adjusted Employer's Quarterly Federal Tax Return or Claim for Refund), claiming entitlement to the ERC. In addition to Q3 2020 and Q2 2021, I Health sought tax relief for the employment tax quarters ending June 30, 2020 (Q2 2020), December 31, 2020 (Q4 2020), and March 31, 2021 (Q1 2021). ECF 14 at 19; *see, e.g.*, ECF 14-3 (Q3 2020 Form 941-X, filed on January 18, 2023).[21] As this Court recently explained:

> The CARES Act was one of several laws that Congress passed in the spring of 2020 to address the economic impacts of COVID-19. The CARES Act included the ERC, a refundable tax credit that subsidized employers who were forced to close or suspend operations due to COVID-19–related public health orders. Using the ERC, eligible employers can reduce the amount paid in employment taxes by 70% of the amount paid to employees during the pandemic-related shutdowns.

---

[21] On its Form 941-X for Q3 2020, I Health explained that it was making corrections "pursuant to the definition of Qualified Wages [c]ontained in the enactment of the Taxpayer Certainty and Disaster Relief Act of 2020 and the American Rescue Plan [A]ct of 2021, as well as the CARES Act." ECF 14-3 at 5. The statutes other than the CARES Act referenced in I Health's Q3 2020 Form 941-X amended the ERC to make it available for additional employment tax quarters. Originally, the ERC applied exclusively to tax year 2020. *See* § 2301(m), 134 Stat. at 351 ("This section shall only apply to wages paid after March 12, 2020, and before January 1, 2021."). Congress extended it twice: first, through the Taxpayer Certainty and Disaster Tax Relief Act of 2020, Pub. L. No. 116-260, 134 Stat. 1182, 3062 (amending Section 2301(m) of the CARES Act to extend the ERC to wages paid until July 1, 2021); and second, through the American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat. 4, 182 (amending the CARES Act to extend the ERC to wages paid until January 1, 2022). Congress later amended the CARES Act to eliminate the availability of the ERC after the third quarter of 2021 for most businesses, including I Health. *See* Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429, 1341 (2021) (amending the CARES Act to terminate the ERC on October 1, 2021, for eligible employers that do not qualify as recovery startup businesses).

Case 1:25-cv-01315-AOB    Document 30    Filed 07/23/26    Page 9 of 18

> If the credit exceeds the amount of employment taxes paid, employers can claim the difference as a cash refund . . . .

*Ne. Health Servs., LLC v. United States*, __ Fed. Cl. __, No. 24-2096, 2026 WL 1530240, at *5 (May 28, 2026) (cleaned up) (quoting *Gravenstein 116, LLC v. United States*, 180 Fed. Cl. 292, 294 (2026) (citing 26 U.S.C. § 3134)).

Before I Health filed this suit on August 8, 2025, the Internal Revenue Service (IRS) issued overpayment notices for Q2 2020, Q4 2020, and Q1 2021. After I Health commenced this action, the IRS issued an overpayment notice for Q2 2021.[22] The Q2 2021 overpayment consisted of $25,143.55 in decreased taxes, $310,103.82 in increased tax credits, and $56,763.03 in allowed interest on credits, resulting in a net tax refund of $392,010.40. I Health's amended complaint, filed on February 2, 2026, omitted the company's original Q2 2021 tax refund claim. The government now seeks to recover the Q2 2021 tax refund via a counterclaim under 26 U.S.C. § 6532(b). I Health's Form 941-X for Q3 2020 remains pending. ECF 14 at 19–20.

## DISCUSSION

### I.    Legal Standard

"[W]hen considering a motion under RCFC 12(c), the court applies substantially the same test as it does for a motion to dismiss for failure to state a claim under RCFC 12(b)(6)." *Sikorsky Aircraft Corp. v. United States*, 122 Fed. Cl. 711, 719 (2015) (first citing *Xianli Zhang v. United States*, 640 F.3d 1358, 1364 (Fed. Cir. 2011); and then citing *Peterson v. United States*, 68 Fed. Cl. 773, 776 (2005)). That is, "the court must assume 'each well-pled factual allegation to be true and indulge in all reasonable inferences in favor of the nonmovant.'" *Id.* (quoting *Owen v. United States*, 851 F.2d 1404, 1407 (Fed. Cir. 1988)). Legal conclusions presented as factual assertions are not, however, entitled to such deference. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). On these premises, "[j]udgment on the pleadings is appropriate where there are no material facts in dispute and the [moving] party is entitled to judgment as a matter of law." *Forest Lab'ys, Inc. v. United States*, 476 F.3d 877, 881 (Fed. Cir. 2007) (citing *N.Z. Lamb Co. v. United States*, 40 F.3d 377, 380 (Fed. Cir. 1994)).

"When deciding a motion for judgment on the pleadings, the court may review 'the content of the competing pleadings, exhibits thereto, matters incorporated by reference in the pleadings, whatever is central or integral to the claim for relief or defense, and any facts of which the . . . court will take judicial notice.'" *T.H.R. Enters., Inc. v. United States*, 160 Fed. Cl. 236, 239 (2022) (quoting 5C WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 1367 (3d ed. 2004)). Documents considered

---

[22] *Compare* ECF 1 at 1, 12–13 (complaint filed August 8, 2025, seeking ERC tax credit for Q2 2021), *with* ECF 16-1 (IRS Notice for Q2 2021 dated September 8, 2025).

9

central to the complaint can include exhibits "whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Toon v. United States*, 96 Fed. Cl. 288, 298–99 (2010) (quoting *In re Syntex Corp. Secs. Litig.*, 95 F.3d 922, 926 (9th Cir. 1996)).

## II.    Eligible Employer

The parties' principal dispute at this juncture is whether I Health qualifies as an eligible employer under the ERC for the employment tax quarter ending on September 30, 2020 (Q3 2020).  The CARES Act defines "eligible employer," in part, as "any employer":

> (i) which was carrying on a trade or business during the calendar quarter for which the credit is determined . . . , and

> (ii) with respect to any calendar quarter, for which—

>> (I) the operation of the trade or business described in clause (i) is fully or partially suspended during the calendar quarter due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to [COVID-19] . . . .

26 U.S.C. § 3134(c)(2)(A).  The parties do not dispute whether I Health was "carrying on a trade or business during" Q3 2020.  Instead, they focus on whether I Health can meet the requirements of clause (ii)(I) of the definition (hereinafter, the "suspension-of-business prong").[23]

The Court recently had occasion to analyze the suspension-of-business prong in a comparable matter involving governmental directives in Massachusetts. *See Ne. Health*, __ Fed. Cl. at __, 2026 WL 1530240, at *6–14.  There, the Court laid out the "three discrete statutory requirements" a taxpayer must establish to show that it is entitled to the ERC:

> [1] that the business was 'fully or partially suspended during the calendar quarter'; [2] that there existed 'orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to [COVID-19]'; and [3] that the suspension of business was caused by (i.e., 'due to') a qualifying order.

*Id.* at *6 (citing 26 U.S.C. § 3134(c)(2)(A)(ii)(I)).  To demonstrate entitlement, I Health must satisfy all three requirements.  Conversely, if the government identifies just one

---

[23] I Health does not invoke the reduction in gross receipts basis for ERC tax relief.  *See* 26 U.S.C. § 3134(c)(2)(A)(ii)(II).

10

requirement that I Health cannot meet, then I Health is ineligible for the claimed tax credit. *See, e.g., id.* at *13–14 (granting motion for summary judgment where plaintiff failed to show that claimed qualifying suspensions were "due to" qualifying governmental orders); *cf. Sundancer Pools, Inc. v. United States*, __ Fed. Cl. __, No. 25-1291, 2026 WL 1830419, at *6 (Fed. Cl. June 23, 2026) ("[A]s they currently stand, the allegations are insufficient to establish that [plaintiff]'s operations were suspended, in whole or in part, during the operative periods, or that any such suspensions were proximately caused by the government orders to which it was subject.").

### A.  Qualifying Government Orders

In assessing I Health's claimed entitlement to the ERC for Q3 2020, the Court must cabin its suspension-of-business analysis to "the calendar quarter for which the credit is determined," *see* 26 U.S.C. § 3134(c)(2)(A)(i), rather than the COVID-19 pandemic as a whole.  Accordingly, the relevant government directives are those in effect between July 1 and September 30, 2020, including:

- Executive Orders N-25-20, N-33-20, and N-60-20, which were issued on March 12, March 19, and May 4, 2020, respectively;

- Governor Newsom's May 7 and August 28, 2020 press releases;

- The Acting State Public Health Officer's May 7 and August 28, 2020 reopening directives;

- The Fresno County Interim Health Officer's directives, dated March 27 and July 23, 2020; and

- The San Diego County Interim Health Officer's directives, dated March 27, April 2, April 9, May 5, May 26, July 29, and August 7, 2020.

These directives can be split into two categories: those issued by a statewide public health authority and those issued by a Fresno County or San Diego County official.

In *Northeast Health*, this Court defined qualifying government order under the ERC as "a government directive [that], as a whole, carr[ies] enforcement authority or otherwise ha[s] the ability to compel a certain course of conduct through the imposition of 'binding requirements or repercussions for noncompliance.'" __ Fed. Cl. at __, 2026 WL 1530240, at *7 (quoting *In re JSmith Civ., LLC*, 674 B.R. 207, 214–15 (Bankr. E.D.N.C. 2025)).  The directives in that case all qualified as "orders" under the suspension-of-business prong because covered businesses "risked enforcement action," including "civil penalties, criminal penalties, and loss of their clinic licenses," if they did not comply with the directives. *Id.* at *8.  The same cannot be said here.

I Health contends that, under California law, "[f]ailure to comply with *any* of the [directives] issued by any Public Health Officer in California was . . . a misdemeanor punishable by fine, imprisonment, or both." ECF 14 at 5 ¶ 25. In support, I Health cites section 120295 of the California Health and Safety Code and sections 69 and 148(a)(1) of the California Penal Code.[24] Those statutes do not confer the blanket enforcement authority that I Health suggests. Section 148(a)(1) of the California Penal Code, for example, imposes civil and criminal penalties for anyone "who willfully resists, delays, or obstructs any public officer, peace officer, or an emergency medical technician . . . in the discharge or attempt to discharge any duty of his or her office or employment . . . ." CAL. PENAL CODE § 148(a)(1) (West 2016). This provision narrowly penalizes *willful* resistance to or obstruction of the *enforcement* of state and local directives; it does not punish mere noncompliance with those directives. I Health's reliance on the other code sections is similarly misplaced.[25]

The Court, then, must look to each directive to discern whether it carries enforcement authority. Governor Newsom's press releases do not. The May 7, 2020 press release includes "guidance" without referencing or discussing enforcement

---

[24] I Health also points to Executive Order N-25-20, asserting that it "direct[ed] all residents to heed any orders or guidance from state and local health officials." ECF 14 at 5. To the extent I Health avers the executive order delegated authority to enforce every subsequent public health directive in California, the Court disagrees. The language relied on by I Health—which expressly contemplates a distinction between "orders" and "guidance"—cannot be read to confer blanket enforcement authority on every follow-on directive. *See* ECF 25-1 at 5 ("All residents are to heed any *orders and guidance* of state and local public health officials . . . to control the spread of COVID-19." (emphasis added)); *see also Ne. Health*, __ Fed. Cl. at __, 2026 WL 1530240, at \*7 ("An 'order' should be understood in contrast to a 'recommendation' . . . ." (quoting *In re JSmith*, 674 B.R. at 214–15)).

[25] Section 69 of the California Penal Code is even narrower, penalizing the use of threats, violence, or force to obstruct an executive function. CAL. PENAL CODE § 69(a). Section 120295 of the California Health and Safety Code, in turn, appears inapplicable. The cited code section provides:

> Any person who violates Section 120130 or any section in Chapter 3 (commencing with Section 120175, but excluding Section 120195), is guilty of a misdemeanor, punishable by a fine of not less than fifty dollars ($50) nor more than one thousand dollars ($1,000), or by imprisonment for a term of not more than 90 days, or by both. He or she is guilty of a separate offense for each day that the violation continued.

CAL. HEALTH & SAFETY CODE § 120295 (West 1997). The cross-referenced section and chapter both appear to address the responsibilities of public health care professionals rather than members of the general public. *See, e.g.*, *id.* § 120130(a) ("Those diseases listed as reportable shall be properly reported as required to the department *by the health officer*." (emphasis added)); *id.* ch. 3 ("Functions and Duties of Local Health Officers."); *id.* § 120190 ("Each *health officer* shall . . . ." (emphasis added)). *But see id.* § 120130(f) ("[N]o civil or criminal penalty . . . *for any person or facility* may be imposed . . . unless the name of the disease or condition that is required to be reported . . . was printed in the California Code of Regulations . . . ." (emphasis added)).

mechanisms or authority, and the August 28, 2020 press release merely announces and describes contemporaneous actions taken by the State Public Health Officer.[26]

The remaining statewide directives, however, maintained "the ability to compel a certain course of conduct through the imposition of 'binding requirements or repercussions for noncompliance.'" *Ne. Health*, __ Fed. Cl. at __, 2026 WL 1530240, at *7 (quoting *JSmith*, 674 B.R. at 214–15). Each of the executive orders cites section 8567 of the government code, which explains that "[t]he [Governor's] orders . . . shall have the force and effect of law." CAL. GOV'T CODE § 8567(a) (West 2012); *see* ECF 25-1 at 5 (Executive Order N-25-20); Cal. Exec. Order No. N-33-20 (March 19, 2020); Cal. Exec. Order No. N-60-20 (May 4, 2020). And the May 7 and August 28, 2020 reopening directives, both issued by the Acting State Public Health Officer, cited provisions of the health and safety code that contemplate broad, enforceable action as the authority under which they would go into effect. *See* CAL. HEALTH & SAFETY CODE § 131080 (West 2007) ("[W]hen in its judgment the public health is menaced, [the Department of Public Health] shall control and regulate the[] action [of all local health authorities]."); *id.* § 120175 (West 1995) ("Each health officer . . . shall take measures as may be necessary to prevent the spread of the disease" "made reportable by regulation of the [D]epartment [of Public Health]."); ECF 25-1 at 13, 18.

Finally, the countywide directives issued by Fresno and San Diego counties carried the enforcement authority required to be considered "orders" under the ERC. They all cited section 120175 of the California Health and Safety Code— which broadly authorizes health officers to "take measures as may be necessary to prevent the spread of the disease"—as the authority under which they were issued.[27] CAL. HEALTH & SAFETY CODE § 120175. Moreover, as noted *supra*, the countywide directives noticed that violators were subject to fine, imprisonment, or both.[28]

B. Causation

Having demonstrated that at least some directives cited by I Health qualify as governmental "orders" under the suspension-of-business prong, the Court turns to whether I Health has adequately pled the requisite level of causation—i.e., whether I Health claims to have "suffered a full or partial suspension 'due to' the qualifying orders." *See Ne. Health*, __ Fed. Cl. at __, 2026 WL 1530240, at *8. Despite initially claiming "myriad disruptions to its business" in its operative complaint, ECF 14 at

---

[26] *See Governor Newsom Releases Updated Industry Guidance*, GOVERNOR GAVIN NEWSOM (May 7, 2020); *Governor Newsom Unveils Blueprint for a Safer Economy, a Statewide, Stringent and Slow Plan for Living with COVID-19*, GOVERNOR GAVIN NEWSOM (Aug. 28, 2020).

[27] *See, e.g.*, ECF 25-1 at 20, 25, 32, 38, 50, 62, 75.

[28] For this authority, the countywide directives cite, among other state laws, Section 120295 of the California Health and Safety Code as well as Sections 69 and 148 of the California Penal Code, discussed *supra*. *See, e.g.*, ECF 25-1 at 22, 29, 35, 42–43, 59, 72, 85.

9–10, I Health has narrowed the scope of its claim in response to the government's dispositive motion:

> I Health is not resting on the measures the Government calls nominal, masks, sanitizer, signage, nor on the federal sick-leave requirement . . . . Although in fairness, while government-imposed mask mandates do have a greater impact in a call center environment (where the ability to communicate and sell over the phone is a critical function) than in a factory, *I Health's entitlement to the [ERC] is based on the order-mandated occupancy cap and worker exclusion* . . . .

ECF 28 at 12 (emphasis added).

"[E]ntitlement to the ERC under the suspension-of-business prong is limited to businesses that can show that a qualifying governmental order was both the factual and proximate cause of a full or partial suspension." *Ne. Health*, __ Fed. Cl. at __, 2026 WL 1530240, at *11. Assuming that the asserted reduction in its in-person workforce constituted a "full or partial suspension," *see infra* Part II(C), I Health has adequately alleged that the suspension was both factually and proximately caused by the qualifying orders because the relevant Fresno and San Diego county orders mandated, under threat of enforcement action, that I Health reduce the capacity of its in-person call centers and exclude workers who tested positive for, or were exposed to, COVID-19.

Fresno County's March 27, 2020 order, and its follow-on July 23, 2020 order, provided that all employers "shall . . . screen all employees for febrile respiratory illness [and] . . . [e]xclude from work all employees that report symptoms . . . for [up to fourteen] days . . . ." ECF 25-1 at 21, 27. San Diego County's August 7, 2020 order similarly provided "[e]ach essential business and reopened business shall . . . prohibit entry to the workplace of employees with a temperature of 100 degrees or more, employees exhibiting COVID-19 symptoms . . . , or employees who have recently been exposed to a person who has tested positive for COVID-19." *Id.* at 80. Through the use of the word "shall," these orders "le[ft] no room for discretion." *Gilda Indus., Inc. v. United States*, 622 F.3d 1358, 1364 (Fed. Cir. 2010) (citing *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644 (2007)). Moreover, San Diego County's May 5, 2020 "Reopen San Diego Business Safety Framework" also "required" "[a]ll businesses . . . to develop a[n] [SRP] that ensure[d] [certain] guidelines [we]re implemented," including directives that employers should "[m]aximize teleworking opportunities," that "[a]ll sick employees must stay at home," and that businesses should "[e]stablish a reduced maximum occupancy that allows for appropriate physical distancing." ECF 25-1 at 45. This is not a situation where a business "complied with . . . orders . . . voluntarily . . . ." *Cf. Ne. Health*, __ Fed. Cl. at __, 2026 WL 1530240, at *12 ("To the extent [plaintiff] complied with those orders, it did so voluntarily, and no reasonable factfinder could conclude that the resulting suspensions were 'due to' the qualifying government orders.").

14

The government counters that I Health's decision to exclude workers cannot be fairly attributed to the qualifying government orders because the insurance agency likely would have excluded sick or COVID-19–exposed employees from the workplace even if the government had not ordered it to do so. ECF 25 at 23 ("Would I Health really have had sick or COVID-19–exposed employees report to work absent a government order? No."). Perhaps the government's prediction is correct—and perhaps not. After all, I Health's focus was presumably on staying in business and maintaining its bottom line during the pandemic-induced economic crisis, whereas the state and local governments' primary concern was public health and safety. At this juncture, the Court's role is limited to determining whether I Health has met its pleading burden as to causation. It has. The government's factual challenges to I Health's theory of causation are the proper subjects of discovery and trial, but they do not entitle the government to judgment as a matter of law. *See Forest Lab'ys*, 476 F.3d at 881 ("Judgment on the pleadings is appropriate where there are no material facts in dispute and the [moving] party is entitled to judgment as a matter of law." (citing *N.Z. Lamb*, 40 F.3d at 380)).

C.  Full or Partial Suspension

The final issue to address is whether a government-mandated occupancy cap, exacerbated by worker exclusion and return-to-work protocols, can qualify as a full or partial suspension of I Health's business under the ERC. On this question, I Health asserts: "a mandated reduction in maximum occupancy is not a hygiene measure that leaves 'the work continued' . . . ; it is the government foreclosing a portion of a fixed-footprint operation." ECF 28 at 11 (citation omitted). In so asserting, I Health recites the proper standard but applies it incorrectly. I Health must plead that a specific, discrete portion of its business temporarily ceased during Q3 2020. The operative complaint fails to do so.

Given that the CARES Act does not define "full or partial suspension," the meaning of that phrase is for the Court to discern. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024). In doing so, the Court may look to "the judgment of the Executive Branch" to "inform [its] inquiry," but it may not delegate the task of statutory interpretation or otherwise defer to the relevant agency's independent analysis. *Id.* at 388, 412–13 (explaining that the weight of an agency's "'interpretations and opinions' . . . would 'depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944))).

I Health claims it suffered a "partial" rather than a "full" suspension of its trade or business. Black's Law Dictionary defines "partial" as "[n]ot complete; of, relating to, or involving only a part rather than the whole." *Partial*, BLACK'S LAW DICTIONARY (12th ed. 2024); *accord Partial*, MERRIAM-WEBSTER ("[O]f or relating to a part rather than the whole: not general or total."), *available at* https://perma.cc/3ZT7-

CLJA. "Suspension," in turn, is "[t]he act of temporarily delaying, interrupting, or terminating something." *Suspension*, BLACK'S LAW DICTIONARY (12th ed. 2024) (using "suspension of business operations" as a contextual illustration). The three verbs used to define suspension (i.e., delay, interrupt, and terminate) connote a cessation or discontinuance of the relevant activity for a certain period of time. *Compare Delay*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("The act of *postponing* or slowing." (emphasis added)), *with Interrupt*, MERRIAM-WEBSTER ("[T]o break the uniformity or continuity of."), *available at* https://perma.cc/L2JG-JJZP, *and Terminate*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("To put an end to; to bring to an end. . . . To end; to conclude."). Combining those definitions, the ordinary meaning of the phrase "partial suspension" of "the operation of [an employer's] trade or business," 26 U.S.C. § 3134(c)(2)(A)(ii)(I), is: a cessation or discontinuance of part of the employer's business. Which raises the question: will any part suffice, no matter how small?

Although the ERC "provided significant, widely available relief to businesses who . . . involuntarily or at the cost of their bottom line" suspended their operations, *Ne. Health*, __ Fed. Cl. at __, 2026 WL 1530240, at *14, it would strain the bounds of reason to interpret the ERC as providing "significant" relief to offset insignificant costs. IRS Notice 2021-20, which was issued to provide guidance on the ERC, agreed: "The mere fact that an employer must make a modification to business operations due to a governmental order does not result in a partial suspension unless the modification has more than a nominal effect on the employer's business operations." IRS (Mar. 15, 2021), *available at* https://perma.cc/29QU-78ZL.

Bringing IRS Notice 2021-20 and the above-quoted definitions together, Judge Kaplan recently defined "full or partial suspension" in *Sundancer Pools*:

> In short, the ordinary meaning of a "partial suspension" of "the operation of [a] trade or business" is a temporary interruption, postponement, or cessation of a more than nominal portion of a business's operations. *Accord JSmith*, 674 B.R. at 214 ("A 'partial suspension,' then is a temporary stoppage of a portion of operations."). And a "full suspension" is a temporary interruption, postponement, or cessation of all operations.

__ Fed. Cl. at __, 2026 WL 1830419, at *4. The plaintiff in that case did not carry its pleading burden because it failed to allege that the orders at issue "caused it to temporarily cease performing a distinct portion of its business." *Id.* at *5–6. The undersigned adopts the same standard and reaches the same conclusion here. To satisfy the partial-suspension requirement, an employer must show that a discrete, more-than-nominal portion of its business ceased during the employment tax quarter at issue. Such suspensions may include, for instance, restaurants suspending in-person dining but continuing takeout and delivery service, retailers suspending on-premises shopping but continuing online sales, and construction companies suspending in-office operations but continuing onsite construction work.

16

I Health has not pled enough here. The insurance agency simply alleges its operations were fully or partially suspended because the state and local governments imposed occupancy caps and health-related employee exclusions. But a reduction in onsite capacity is not necessarily a cessation of a discrete, more-than-nominal portion of I Health's operations. *See Sundancer Pools*, __ Fed. Cl. at __, 2026 WL 1830419, at *5–6. According to the operative complaint, I Health's call centers continued operating throughout Q3 2020, albeit with unspecified reductions in onsite customer service representatives reportedly attributable to the government-imposed occupancy caps and health-related employee exclusions. ECF 14 at 17 ("Plaintiff maintained its workforce in-person to the extent it was able."); *id.* at 17–18 ("Plaintiff was able to transition a small portion of its workforce to remote work, at the behest of the Relevant Governmental Orders."). But to qualify for the ERC, I Health must further allege that a qualifying government order factually and proximately "caused it to temporarily cease performing a distinct portion of its business." *Sundancer Pools*, __ Fed. Cl. at __, 2026 WL 1830419, at *5.

III.    Leave to Amend

In closing, I Health provisionally requests leave to file a second amended complaint to allege additional facts "[i]f the Court concludes that any requirement is pleaded with insufficient specificity[.]" ECF 28 at 15. RCFC 15(a)(2) provides that "[t]he court should freely give leave when justice so requires." Notwithstanding the government's futility arguments, the Court will grant I Health leave to further amend its complaint to address the deficiencies identified herein. Three critical facts support extending I Health the requested grace. First, it was not until after I Health filed its second amended complaint that this Court issued both *Northeast Health* and *Sundancer Pools*, addressing the requirements for ERC tax relief for the first time in this Circuit. *See Ne. Health*, __ Fed. Cl. at __, 2026 WL 1530240, at *1 ("This COVID-19–related tax refund claim presents issues of first impression in this Circuit."). Second, allowing a plaintiff to amend its complaint to cure similar pleading deficiencies, while deferring ruling on the government's dispositive motion, was sanctioned by the Court in *Sundancer Pools*. __ Fed. Cl. at __, 2026 WL 830419, at *6; *cf. Ne Health*, __ Fed. Cl. at __, 2026 WL 1530240, at *1 (addressing parties' cross-motions for summary judgment; plaintiff did not request leave to file an amended complaint). Third, it is not lost on the Court that a summary dismissal of I Health's $50,000 ERC tax refund claim for Q3 2020 at this early stage might have an outsized influence on the government's $400,000 ERC-based counterclaim for Q2 2021.

**CONCLUSION**

For the foregoing reasons, I Health's motion for leave to file an amended complaint (ECF 28) is granted. I Health shall file an amended complaint on or before **August 6, 2026**. Until such time, the Court defers ruling on the government's motion for judgment on the pleadings (ECF 25).

17

It is so **ORDERED**.

_____
Armando O. Bonilla
Judge